ROBERT E. and SHIRLEY A. SWANSON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Swanson v. Commissioner
Docket No. 5624-79.
United States Tax Court
T.C. Memo 1981-132; 1981 Tax Ct. Memo LEXIS 614; 41 T.C.M. (CCH) 1129; T.C.M. (RIA) 81132; March 23, 1981. *614 Robert E. Swanson, pro se. Robert L. Archambault, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined a deficiency in petitioners' income tax for the calendar year 1972 in the amount of $ 7,737.06 and an addition to tax under section 6653(a), I.R.C. 1954, [1] of $ 457,24. The only issue for decision is whether petitioners' taxable income should be increased by $ 24,500 computed by reference to bank deposits and cash payouts plus personal and other nondeductible expenditures. [2] The determination of this issue depends upon whether petitioners made a $ 24,500 cash payment on the purchase price of certain property on North 48th Street in Omaha, Nebraska. FINDINGS OF FACT Robert E. Swanson (petitioner) and Shirley A. Swanson, husband and wife, who resided in Apopka, Florida, at the time of the filing *615 of the petition in this case, filed a joint Federal income tax return for the calendar year 1972. By deed dated October 20, 1972, Harry S. Chandler and Anna M. Chandler transferred to Robert Swanson, trustee, specifically described property which was a house located at North 48th Street in Omaha, Nebraska. The deed provided for an assumption by the grantee of a mortgage with the principle balance of $ 37,239.39. Mr. Chandler had owned the house on North 48th Street for some period of time. At one point a portion of the lot had been condemned for highway construction. The lot contained a house and a three-car garage. The property had been vacant since sometime in 1967 and had been put up for sale by Mr. Chandler in 1971. It had initially been listed at $ 72,950 with a real estate firm. The price had later been reduced by this firm to $ 65,000 and still later reduced to $ 59,730. No offers on the property had been received by the firm or Mr. Chandler and beginning in 1972 Mr. Chandler attempted to sell the property for $ 40,000 approaching several people with an offer to sell it at that price. Not having been able to dispose of the house, Mr. Chandler in 1972 applied for *616 a loan on the property in the approximate amount of $ 38,000. In connection with the making of this loan the Commercial Savings and Loan Association had an appraisal of the property made. This appraisal shows an estimated value of the land of $ 4,000 and of the improvements of $ 48,000 for a total estimated value of $ 52,000. Mr. Chandler did receive the loan of approximately $ 38,000 which was the loan assumed in the purchase of the property. Sometime in the latter part of 1972 a friend of Mr. Chandler's advised him that he knew of someone interested in purchasing the house. A woman real estate agent brought petitioner and Mr. Bill Torrence to see Mr. Chandler and Mr. Chandler agreed to sell the house to Robert Swanson, trustee. At that time Mr. Chandler was given $ 5,000 in cash and later, on October 20, 1972, in an attorney's office when settlement was being effected on the house, there was $ 19,500 in cash on the table in a room in which petitioner, Mr. Bill Torrence, and Mr. Chandler were. Mr. Chandler did not know who gave him the $ 5,000 or who put the money on the table. Mr. Chandler later deposited, or had his wife deposit, small amounts at a time of the $ 24,500 *617 in cash in his bank account. Initially on his tax return he reported this as ordinary income without designating it as an amount received for a sale of a house. Later when his income tax return was being investigated by respondent, he changed the method of reporting the $ 24,500 to include it as receipts from the sale of the house. Mr. Chandler signed a document dated October 20, 1972, the same day as the date of the deed, stating: Received from Robert Swanson * * * $ 24,500.00 * * * for property knows as 11122 North 48th Street, Omaha, Nebraska Loan to be assumed, $ 37,239.39, at Commercial Savings and Loan, Omaha, Nebraska. Owner agrees to deliver a marketable title for said house and ground. * * * Escrow account is to be included in the $ 37,239.39. Dated this 20th day of October, 1972 If said loan cannot be assumed, Owner agrees to enter into Land Contract under same terms. After the purchase of the house, Mr. Bill Torrence moved into it and lived there for several years until he was arrested and convicted in connection with the possession and sale of narcotics. Petitioner filed with the Tax Commissioner of the State of Nebraska a real estate transfer statement *618 showing the transfer of the property on North 48th Street by warranty deed dated October 20, 1972, for total consideration of $ 42,500. On his income tax return for the calendar year 1972 petitioner showed the house as rental property with rent of $ 1,500 received. He showed the price paid for the property as $ 42,500 of which the land value was $ 4,500. He claimed depreciation and other expenses in connection with the rental of the property on this basis. Respondent in his notice of deficiency determined that petitioner's income should be increased by $ 24,500 with the following explanation: (b) In the absence of adequate records, your adjusted gross income for 1972 was computed by reference to bank deposits and cash payouts, plus personal and other nondeductible expenditures, and in this computation a cash payment by you of $ 24,500.00 on the purchase of property known as 11122 North 48th Street has been included as other income. Accordingly, your adjusted gross income as previously revised and agreed to for 1972 by your execution of a partial agreement, has been increased by $ 24,500.00, computed as shown in Exhibit A. Exhibit A shows the following: Robert E. and Shirley *619 A. Swanson Year ended December 31, 1972 Exhibit A %deposits: Robert or Shirley Swanson
$ 6,635.79
Robert or Shirley Swanson Real Estate
8,749.68
Robert Swanson or Ronald Migis
36,406.66
Robert Swanson - Northside Bank
1,600.00
Total deposits
$ 53,392.13
Less: Check transfers between accounts
$ 800.00
Savings account withdrawals deposited
925.00
Reimbursements deposited
7,202.23
Loan repayment by Omaha Home & Roofing
800.00
Proceeds from loans deposited
6,000.00
Redeposits
722.00
Return of purchase price - 2719 No. 48th
Avenue
340.16
Non-income deposits - other
1,692.08
18,481.47
Net deposits resulting from business receipts
$ 34,910.66
Receipts per return assumed deposited: Wages - Omaha Home & Roofing
$ 4,600.00
Gross rents
9,274.00
13,874.00
$ 21,036.66
Add: Cash out
$ 200.00
Additional other income - withholding tax
792.00
Living expense paid by cash
1,200.00
Note payments in cash
22,000.00
Improvements furnished by Omaha Home &
Roofing (dividend)
867.28
1971 Crelin purchased with cash
900.00
Cash payment for purchase of 11122 North
48th Street property
24,500.00
50,459.28 $ 71,495.94
Less: Notes and loans not deposited
39,000.00
Total revised other income
$ 32,495.94
Other income previously agreed to
7,995.94
Increase to taxable income for additional
other income
$ 24,500.00
*620 OPINION The sole issue in this case is the factual one of whether in computing petitioner's income by the bank deposits and cash payouts method petitioner should be charged with the cash expenditure of $ 24,500. Petitioner testified specifically that he did not pay $ 24,500 cash to Mr. Chandler. Respondent offered the testimony of Mr. Chandler. The general import of Mr. Chandler's testimony was that Bill Torrence paid him the $ 24,500. Although he was hesitant to state why he, or his wife, made periodic deposits of the cash in amounts ranging from $ 2,000 to $ 3,000, he said it was because of an agreement he had with someone. He apparently intended to give the impression that the agreement was with Bill Torrence. In fact, when Mr. Chandler was specifically asked by petitioner if petitioner gave him the $ 5,000, Mr. Chandler answered "You as an individual, no." Since it appears that the real estate agent and Bill Torrence were the only people in the house with Mr. Chandler and his wife when Mr. Chandler was given the $ 5,000, the clear inference is that the $ 5,000 was given to him by Bill Torrence. As to the balance of $ 19,500 Mr. Chandler testified that when he went *621 in to close the transaction, that amount was in a paper bag on a table and he did not know who put it there. At several places Mr. Chandler in his testimony inferred that Bill Torrence had put the money on the table. When questioned by the Court about the deposits of $ 24,500 in small amounts at a time, Mr. Chandler testified as follows: THE COURT: Well, why didn't you deposit it all at once if you got it all at once? THE WITNESS: Because I selected to do it that way. THE COURT: Where did you keep it until you deposited it? THE WITNESS: Well, I had to select to do it that way. THE COURT: Why did you have to select to do it that way? THE WITNESS: I just decided to do it that way. THE COURT: Well, where did you keep the cash until you deposited it? THE WITNESS: Oh, I just kept it at home. THE COURT: And you have a habit of keeping cash like $ 24,500 in your house? THE WITNESS: Not really. THE COURT: Well, why did you decide to keep this that way? THE WITNESS: I don't know how to answer that question. I had to decide to do it that way. THE COURT: You had to? THE WITNESS: More or less. THE COURT: Well, why? THE WITNESS: Well, the agreement *622 wasn't that. THE COURT: What agreement wasn't that? THE WITNESS: It wasn't in the agreement for me to do it that way. THE COURT: Agreement with who? THE WITNESS: With whoever bought the house. I think we're short one party in the room that's involved with this house transaction. THE COURT: Who was involved in it besides-- THE WITNESS: I think Bill Torrence should be sitting in here if it's going to come down to this. THE COURT: You think what? THE WITNESS: I think Bill Torrence should be sitting in the room here, because I think there's more to this than what's in this courtroom. THE COURT: Well, go ahead and tell me what you think there is to it because I have a hard-- THE WITNESS: I don't think Bob Swanson gave me a dime, really. THE COURT: You don't think-- THE WITNESS: I don't think this man made a dime off what they're asking him to pay tax. I don't think he paid a dime of it. THE COURT: You don't think that Mr. Swanson paid you the money? THE WITNESS: I think somebody connected with him probably was. THE COURT: All right, who do you think paid you the money? THE WITNESS: Who's the trustee involved in this? THE COURT: Who do you *623 think paid you the money? THE WITNESS: Where do I think it come from? THE COURT: Yes. THE WITNESS: I really don't know. I can't say in court who gave it to me but I don't think he did. When further questioned about how he reported the sale and why he deposited the $ 24,500 piecemeal, Mr. Chandler testified-- THE WITNESS: Well, if I didn't show it on my income tax return that I sold the property for $ 64,000 what he used for a figure instead of $ 37,000 like I did, the reason for that is--well, I can't really answer that. I would incriminate myself if I did that.I don't think I should have to answer that question. THE COURT: You mean that you think you would be liable to some criminal prosecution if you answered that question? THE WITNESS: No, not really. THE COURT: Well then if you don't, answer it. THE WITNESS: It was part of the agreement of the sale of the house to do it that way, really. THE COURT: Well, who did you agree to that with? You just said it wasn't Bob Swanson. THE WITNESS: Bill Torrence, I'd have to say. He's not here. THE COURT: He's not here, but what did Bill Torrence have to do with this house? THE WITNESS: Well, he moved *624 in it right after it was purchased, for one thing. And maybe it was worth a certain amount of money to him to be able to live in that neighborhood. I don't know.I don't know what the agreement was between that side. The only thing I did, I sold the house, I collected the correct amount of money, I entered it a little bit different from what was normal-- THE COURT: Well, you think Bill Torrence gave you the money. What did he give you $ 24,500 for? THE WITNESS: What did he give it to me for? THE COURT: Yes.
THE WITNESS: To make up the difference between $ 37,000 and the total figure of what the house was sold for. THE COURT: Well, did you have any contract to sell that house for $ 65,000? THE WITNESS: No. On the basis of the evidence in this record, we conclude that petitioner did not make the cash payment of $ 24,500 to Mr. Chandler in connection with the North 48th Street property. The deficiency as determined by respondent raises only the issue of whether in computing income on a bank deposits plus cash payouts basis petitioner made the $ 24,500 cash outlay. Respondent has made no other contention with respect to the $ 24,500 being income to petitioner in *625 total or in part. Since there were adjustments made in the notice of deficiency which were not contested in the petition, Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the year here in issue, unless otherwise stated. ↩
2. There were other adjustments in the amount of $ 10,027.65 made in the notice of deficiency which were not placed in issue by petitioners in the petition.↩